[No. B214200. Second Dist., Div. Three. July 19, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
GARY GLAZIER, Defendant and Appellant.

## COUNSEL

Jonathan P. Milberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, James William Bilderback II and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KLEIN, P. J.**—Defendant and appellant, Gary Glazier, appeals his conviction of first degree attempted burglary (Pen. Code, §§ 459, 664).[1] Glazier used a paint sprayer filled with gasoline and a 20-foot-long torch to set fire to his neighbor's house while he remained on his own property. Glazier claims he should not have been convicted of attempted burglary under the burglary-by-instrument doctrine.

We disagree. As interpreted by case law, the limitations on the burglary-by-instrument doctrine have no application in this situation. Glazier's conduct fell within the parameters of the doctrine. Therefore, substantial evidence supports his attempted burglary conviction under the burglary-by-instrument doctrine. The judgment is affirmed.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *Glazier's charged offenses.*

On November 26, 2007, Glazier was accused, in an indictment returned in the Los Angeles Superior Court, of arson and related charges. The court

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

dismissed several charges upon the defense's motions. The resulting accusatory pleading charged Glazier with arson of an inhabited structure or property (count 1; § 451, subd. (b)), attempted first degree burglary (count 2; §§ 459, 664),[2] and possession of flammable material (count 3; § 453, subd. (a)).

2. *Evidence presented at trial.*

On October 17, 2008, the matter came on for a jury trial. Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103]), the evidence at trial established the following.

In 1998, Albert Artsvelyan, his wife, and their children moved into a house in La Crescenta, next door to defendant Glazier. The Artsvelyans made friends with many of their neighbors, but were unable to establish a friendly relationship with Glazier. They first attempted to introduce themselves to Glazier when they moved in by taking a bottle of wine to his house, but he would not answer the door even though the Artsvelyans could tell he was home. The Artsvelyans saw Glazier driving around the neighborhood, but were never able to talk to him. When Mr. Artsvelyan attempted to introduce himself again, after Glazier got into an argument with city workers outside his house, Glazier told him he was a bad neighbor and ordered him off his property.

In 2003, the Artsvelyans began an extensive remodel of their home, staying at a relative's house nearby when the construction interfered with their daily life. Even when sleeping at their relative's home, however, the Artsvelyans returned to their property regularly. On the night of May 11, 2004,[3] the Artsvelyans met at their house, which was still under construction, to see the newly installed swimming pool and pool lights. As they were admiring the lights and talking loudly, they heard Glazier's door slam and then all the lights in their backyard, including the pool lights, suddenly went out. Given Glazier's hostile attitude toward them, the Artsvelyans suspected he had shut off their power. The Artsvelyans returned to their relative's house for the night once Mr. Artsvelyan fixed the lights.

On May 12, Mr. and Mrs. Artsvelyan visited the house to check the mail, visit neighbors, and turn off the pool filter. Mr. Artsvelyan also checked surveillance video from multiple hidden cameras he had installed following

---

[2] Count 2 was amended to charge attempted, rather than completed, burglary, because that is how the crime was originally alleged in the indictment.

[3] All further calendar references are to the year 2004 unless otherwise specified.

several deeply disturbing events involving Glazier.[4] The Artsvelyans left the house to return to their relative's home at 11:30 p.m. Around 4:00 a.m., they were awakened and told their house was on fire. They drove to their house and found it ablaze. The events leading up to the fire were captured on videotape by the Artsvelyans' surveillance system.

The videotapes showed that at 3:15 a.m. a beam of light suddenly illuminated the Artsvelyans' house. This light came from Glazier's property, about 20 feet away. Shortly after, while standing on his own property, Glazier used an implement, subsequently determined to be a pressurized paint sprayer, to spray something into the crawl space underneath the ground floor of the Artsvelyans' house. The crawl space was open due to the remodeling project. Glazier then extended a long pole, with a flame burning on the end of it, into the crawl space. The flame ignited what was later determined to be gasoline vapor, setting the house on fire. Glazier never left his own property during this course of events.

Police and firefighters responded to the fire. Glazier was detained and his property searched. A paint sprayer and its attachments were found in his truck. The paint sprayer contained burnt gasoline. Subsequent testing determined it was capable of spraying gasoline in the manner shown on the surveillance video when modified with hoses and other attachments found on Glazier's property. PVC (polyvinyl chloride) pipes that were long enough to stretch from Glazier's property into the Artsvelyans' house were found in Glazier's garage.

3. *Glazier's conviction and sentence.*

The jury found Glazier guilty as charged on all three counts. Glazier was sentenced to eight years in prison for the arson count. Sentences for the counts of attempted first degree burglary and possession of flammable material were stayed pursuant to section 654.

Glazier appealed the judgment of conviction.

---

[4] The trial court excluded evidence regarding the most serious of these incidents, but referred to them during sentencing. For example, in 2000, the Artsvelyans found antifreeze-soaked dog biscuits in their yard. They also found dog food not belonging to them and a pile of melted chocolate in their yard. Shortly thereafter, their dog died of kidney failure. The Artsvelyans suspected Glazier of poisoning their dog. Then, in February 2004, the Artsvelyans' house was set on fire while they were asleep inside. Luckily, the family escaped unharmed. The Artsvelyans, as well as the detective who investigated the fire, suspected Glazier of starting it. However, Glazier's earlier trial for arson ended in a hung jury.

### CONTENTION

Glazier's sole contention on appeal relates to the attempted burglary count. He contends there was insufficient evidence to support his attempted burglary conviction under the burglary-by-instrument doctrine.

### DISCUSSION

1. *Legal principles.*

Section 459 provides, in pertinent part: "Every person who enters any house . . . with intent to commit a grand or petit larceny or any felony is guilty of burglary." Under section 460, "burglary of an inhabited dwelling house . . . is burglary of the first degree."

██ "[B]urglary may be committed by using an instrument to enter a building—whether that instrument is used solely to effect entry, or to accomplish the intended larceny or felony as well." (*People v. Davis* (1998) 18 Cal.4th 712, 717 [76 Cal.Rptr.2d 770, 958 P.2d 1083].) This burglary-by-instrument doctrine originated in the common law, although "the common law drew a puzzling distinction. An entry by instrument was sufficient for burglary only if the instrument was used to commit the target larceny or felony. Insertion of an instrument for the sole purpose of gaining entry to the building did not constitute burglary. [¶] The common law drew no such distinction if any part of the defendant's body entered the building." (*Id.* at p. 716.) "[T]he reason for this rule is not clear, and California courts have declined to adopt it."[5] (18 Cal.4th at p. 717.)

In *Davis*, the defendant inserted a forged check into the security chute at the walkup window of a check-cashing business. The defendant's intent was to defraud the business. Citing *People v. Ravenscroft* (1988) 198 Cal.App.3d 639 [243 Cal.Rptr. 827], which affirmed a burglary conviction where the defendant had inserted a stolen ATM card into an ATM attached to the exterior wall of the bank, *Davis* agreed with *Ravenscroft* that the ATM card constituted an "instrument" covered by the burglary-by-instrument doctrine, but disagreed with *Ravenscroft*'s ultimate conclusion: "[I]t does not necessarily follow . . . that insertion of a stolen card into an ATM constitutes burglary." (*People v. Davis, supra,* 18 Cal.4th at p. 719.)

---

[5] "The origin of the distinction between entry of an instrument and a body part was due to the 'ancient style of lock and key [where the key, when inserted,] went entirely through and extended a fraction of an inch on the other side. And the special rule in regard to a tool or instrument was developed to insure that the mere insertion of the key would not be held sufficient to complete the burglary.' Perkins & Boyce, Criminal Law 254." (*Commonwealth v. Cotto* (2001) 52 Mass.App.Ct. 225 [752 N.E.2d 768, 771, fn. 10].)

As *Davis* explained:

"The Court of Appeal in *Ravenscroft* appeared to reason that because an entry by means of an instrument is not limited to the use of traditional burglar's tools, there are no limitations within the meaning of the burglary statute on what constitutes entry by means of an instrument. It certainly is within the scope of the burglary statute to recognize that using a cutting tool to breach the walls, doors, or windows of a building constitutes an entry, whether the burglar uses traditional burglar tools or a laser, and that using an instrument to reach into a building and remove property constitutes burglary whether that instrument is a hook or a robot. These are the traditional types of entry prohibited by the burglary statute, even though the entry may be accomplished in new ways.

"Inserting a stolen ATM card into the designated opening in an ATM is markedly different from the types of entry traditionally covered by the burglary statute, as is passing a forged check through a chute in a walk-up window. In each situation the defendant causes an object to enter the air space of a building, but it is not apparent that the burglary statute was meant to encompass such conduct. It is important to establish reasonable limits as to what constitutes an entry by means of an instrument for purposes of the burglary statute. Otherwise the scope of the burglary statute could be expanded to absurd proportions. For example, the Attorney General asserted at oral argument that mailing a forged check from New York to a bank in California, or sliding a ransom note under a door, would constitute burglary. A person who mails a forged check to a bank or slides a ransom note under a door causes that forged check or ransom note to enter the building, but it cannot reasonably be argued that these acts constitute burglary. Under the expansive approach to the burglary statute taken by the Attorney General and reflected in the *Ravenscroft* decision, it is difficult to imagine what reasonable limit would be placed upon the scope of the burglary statute. It could be argued similarly that a defendant who, for a fraudulent purpose, accesses a bank's computer from his or her home computer via a modem has electronically entered the bank building and committed burglary.

"*The crucial issue, not considered by the court in* Ravenscroft, *is whether insertion of the ATM card was the type of entry the burglary statute was intended to prevent.* In answering this question, we look to the interest sought to be protected by the burglary statute in general, and the requirement of an entry in particular." (*People v. Davis, supra,* 18 Cal.4th at pp. 719–720, italics added.)

"The interest sought to be protected by the common law crime of burglary was clear. At common law, burglary was the breaking and entering of a

dwelling in the nighttime. The law was intended to protect the sanctity of a person's home during the night hours when the resident was most vulnerable. As one commentator observed: 'The predominant factor underlying common law burglary was the desire to protect the security of the home, and the person within his home. Burglary was not an offense against property, real or personal, but an offense against the habitation, for it could only be committed against the dwelling of another. . . . The dwelling was sacred, but a duty was imposed on the owner to protect himself as well as looking to the law for protection. The intruder had to break and enter; if the owner left the door open, his carelessness would allow the intruder to go unpunished. The offense had to occur at night; in the daytime home-owners were not asleep, and could detect the intruder and protect their homes.' [Citation.]" (*People v. Davis, supra*, 18 Cal.4th at p. 720.)

■ "In California, as in other states, the scope of the burglary law has been greatly expanded. There is no requirement of a breaking; an entry alone is sufficient. The crime is not limited to dwellings, but includes entry into a wide variety of structures. The crime need not be committed at night. 'Of all common law crimes, burglary today perhaps least resembles the prototype from which it sprang. In ancient times it was a crime of the most precise definition, under which only certain restricted acts were criminal; today it has become one of the most generalized forms of crime, developed by judicial accretion and legislative revision.' " (*People v. Davis, supra*, 18 Cal.4th at pp. 720–721.)

■ But despite section 459's expanded scope, *Davis* concluded the fundamental purpose of the burglary statute remains the protection of an occupant's possessory interest in the safe habitation of a building. (See *People v. Gauze* (1975) 15 Cal.3d 709, 714 [125 Cal.Rptr. 773, 542 P.2d 1365] [defendant could not be convicted for burglarizing his own home: "A burglary remains an entry which invades a possessory right in a building. And it still must be committed by a person who has no right to be in the building."]; *People v. Superior Court (Granillo)* (1988) 205 Cal.App.3d 1478, 1485 [253 Cal.Rptr. 316] ["the burglary law is designed to protect a possessory right in property against intrusion and the risk of harm"].)

And in the case of an ATM or a check-cashing window, *Davis* found this fundamental purpose was missing: "Inserting a stolen ATM card into an ATM, or placing a forged check in a chute in the window of a check-cashing facility, is not using an instrument to effect an entry within the meaning of the burglary statute. Neither act violates the occupant's possessory interest in the building as does using a tool to reach into a building and remove property. It is true that the intended result in each instance is larceny. But the use of a tool to enter a building, whether as a prelude to a physical entry or to remove

property or commit a felony, breaches the occupant's possessory interest in the building. Inserting an ATM card or presenting a forged check does not. Such acts are no different, for purposes of the burglary statute, from mailing a forged check to a bank or check-cashing facility." (*People v. Davis, supra,* 18 Cal.4th at p. 722, fn. omitted.) "[W]e conclude that defendant's placement of a forged check in the chute of the walk-up window of the check-cashing facility . . . cannot reasonably be termed an entry into the building for purposes of the burglary statute." (*Id.* at p. 724.)

### 2. *Discussion.*

Glazier argues upholding his attempted burglary conviction would "represent[] a completely unwarranted expansion of the doctrine of burglary by instrument and [would be] contrary to the limitations placed upon that doctrine" by *Davis.* We disagree.

#### a. *Burglary-by-instrument doctrine is not restricted to larceny.*

Glazier initially asserts "[t]he relevant cases hold that the evidence is sufficient to establish burglary *only* where the tools or instruments are used to help the defendant himself gain entry to the premises or *to reach into the building and remove property.*" (Italics added.) Not so.

■ For situations in which the instrument was not used to effect an entry, *Davis* did not restrict the burglary-by-instrument doctrine to cases where a tool was used to "reach into the building and remove property." Indeed, *Davis* said: "[T]he use of a tool to enter a building, whether as a prelude to a physical entry *or to remove property or commit a felony,* breaches the occupant's possessory interest in the building." (*People v. Davis, supra,* 18 Cal.4th at p. 722, italics added.) Glazier cites no authority, and provides no reasoned argument, supporting such a limitation on the doctrine. The cases show that a burglar's culpable intent can include a wide variety of felonies that do not involve removing property from the building. (See *People v. Mason* (1960) 54 Cal.2d 164, 169 [4 Cal.Rptr. 841, 351 P.2d 1025] [entry with intent to commit felonious assault]; *People v. Martinez* (2002) 95 Cal.App.4th 581, 585–586 [115 Cal.Rptr.2d 574] [entry with intent to take a shower, which involved using victim's soap, shampoo and water]; *People v. Rehmeyer* (1993) 19 Cal.App.4th 1758, 1765–1766 [24 Cal.Rptr.2d 321] [entry with intent to commit indecent exposure]; *People v. Nance* (1972) 25 Cal.App.3d 925, 931–932 [102 Cal.Rptr. 266] [entry with intent to activate electric switch so exterior gas pump could be accessed].)

■ Contrary to Glazier's argument, the burglary-by-instrument doctrine is not applicable only where the instrument is used either to effect an entry, or

to reach into the building and remove property. Glazier's use of the flaming pole to commit arson inside the Artsvelyans' house was sufficient to sustain his conviction under the burglary-by-instrument theory.

### b. *Davis's limitations on the burglary-by-instrument doctrine do not affect the validity of Glazier's conviction.*

Glazier points to *Davis*'s conclusion that some limitations must be put on the burglary-by-instrument doctrine in order to avoid absurd results. He argues, "The Legislature never intended the term 'enter' as used in the burglary statute to encompass projecting a stream of gasoline a distance of approximately 20 feet from the defendant's property into the victim's home and then igniting the gasoline by extending a metal pipe with a lighting device. While Appellant may have used these 'instruments' to 'enter' the residence, not all entries by instrument qualify as entries covered by the burglary statute."

However, the criterion used by *Davis* to set the limitation was this question: Was the defendant's entry the type of entry the burglary statute was intended to prevent because it "breache[d] the occupant's possessory interest in the building." (*People v. Davis, supra*, 18 Cal.4th at p. 722.) Glazier's intrusion into the Artsvelyans' home constituted an entry under the burglary statute because it violated not just one, but both interests the statute is meant to protect.

### (1) *Violation of victims' possessory interest.*

█ Glazier's intrusion violated the Artsvelyans' possessory interest in their house. A possessory interest is "[t]he present right to control property, including the right to exclude others, by a person who is not necessarily the owner." (Black's Law Dict. (8th ed. 2004) p. 1203.) The Artsvelyans had a right to exclude others from entering their crawl space because they inhabited the property.

The *Davis* analysis turned on the fact that, in the case of someone inserting a check into a chute, an ATM card into an ATM, or a library book into a book drop, he or she is putting an "instrument" where the occupant *intended* it to go. As a result, there is no invasion of the occupant's possessory interest. Clearly the Artsvelyans did not *intend* to have a flaming torch inserted into their crawl space. Therefore, Glazier violated the Artsvelyans' possessory interest in their property.

### (2) *Danger to the victims.*

Glazier argues, "While the [Artsvelyans'] possessory interest in their home may have been invaded, there was no possibility of a violent confrontation

between the victims and the intruder since (a) Appellant Glazier never attempted to enter the victims' home or even set foot on their property and (b) the victims were not residing in their home at the time."

■ But Glazier is ignoring the fact his violation of the Artsvelyans' possessory interest threatened " ' "the germination of a situation dangerous to personal safety." ' " (*People v. Davis, supra*, 18 Cal.4th at p. 721.) Had the Artsvelyans seen Glazier inserting a flaming torch into their house, they might have reacted violently or in a manner that created danger. Had they been home, the Artsvelyans would have been thrust into the dangerous situation of trying to escape from a burning house. The fact they were not home is immaterial for purposes of first degree burglary because their absence did not alter the building's character as an inhabited dwelling. The burglary statute defines "inhabited" as "currently being used for dwelling purposes, *whether occupied or not.*" (§ 459, italics added.) "[A] dwelling is inhabited if the occupant is absent but intends to return and to use the house as a dwelling." (*People v. Ramos* (1997) 52 Cal.App.4th 300, 302 [60 Cal.Rptr.2d 523]; see also *People v. Hernandez* (1992) 9 Cal.App.4th 438, 442 [11 Cal.Rptr.2d 739] ["a place of settled residence from which [the occupants] were merely temporarily absent" constituted an inhabited dwelling].) The Artsvelyans, although temporarily absent, intended to return to use their house as a dwelling upon completion of the remodeling project. Indeed, they were so excited to return they visited the property frequently and went swimming in the pool. They were at the house just a few hours before Glazier set it on fire.

Moreover, and contrary to Glazier's apparent understanding, *Davis* does not require both interests to be violated. As our Supreme Court subsequently said in *People v. Valencia* (2002) 28 Cal.4th 1 [120 Cal.Rptr.2d 131, 46 P.3d 920]: "In *Davis,* we held that the placing of a forged check into a chute in a walk-up window at a check-cashing facility was not 'the type of entry the burglary statute was intended to prevent,' because it did not violate any occupant's possessory interest in a building *or* his or her personal interest in freedom from violence that might ensue from unauthorized intrusion. [Citation.]" (*Id.* at p. 13, italics added.)

■ "It is true that . . . one of the purposes of California's burglary laws is to protect against the dangers to personal safety created by the 'usual burglary situation.' [Citations.] However, . . . the primary purpose is to protect a possessory right in property. Thus, if there is an invasion of the occupant's possessory rights, the entry constitutes burglary regardless of whether actual or potential danger exists." (*People v. Salemme* (1992) 2 Cal.App.4th 775, 781 [3 Cal.Rptr.2d 398].) "In effect, defendant would write into section 459 the requirement that the perpetrator must intend to commit a felony which poses

a physical danger to the victim, rather than 'any felony' as specified by the Legislature." (*Id.* at pp. 781–782.)

Glazier's intrusion into the Artsvelyans' crawl space was the type of entry the burglary statute was intended to prevent. As such, it is not the kind of burglary-by-instrument case *Davis* was worried might be used to expand section 459 to absurd proportions.

In sum, because Glazier's conduct fell within the parameters of the burglary-by-instrument doctrine, as interpreted by *Davis*, there was sufficient evidence to sustain his conviction.

### DISPOSITION

The judgment is affirmed.

Croskey, J., and Kitching, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 27, 2010, S185332. Corrigan, J., did not participate therein.